# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

§
§
In re Grand Jury Investigation§Misc. No. 09-118 (RCL)
of Possible Violation of§
18 U.S.C. § 1461 et seq.§UNDER SEAL **FILED**
§
§ OCT 2 6 2009
§

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

## MEMORANDUM AND ORDER

The United States has requested that this Court compel Company X to comply with four subpoenas issued by a grand jury sitting in this district and served on Company X on September 5, 2008. Having considered the United States' motion to compel, Company X's response, the reply thereto, and the arguments of counsel, the United States' motion is granted in part and denied in part for the reasons set forth below.

## I. BACKGROUND

On September 5, 2008, the United States served four grand jury subpoenas on Company X. *Gov't Motion to Compel* at 2 [hereinafter *Motion*]. The subpoenas sought four categories of information:[1]

(1) the name, address, and telephone number of the businesses that processed financial transactions for Company X between December 1, 2007 and June 30, 2008;

(2) the names, positions, hours, location of employment, home address and telephone numbers for all persons employed by Company X between December 1, 2007 and June 30, 2008;

---

[1] The numbers in this list correspond to the numbers of the subpoenas as referenced in the United States' motion.

(3) a copy of records identifying the true name(s) and alias(es) of the owner(s) of Company X from its date of incorporation up to and including June 2008;

(4) a copy of records that show the identity of all movies sold or distributed, including the date of each transaction, payment received, and method and date of each of each shipment, from customer purchases from the website/domain name www.[_____].com between December 1, 2007 and December 15, 2007, and April 1, 2008 and April 15, 2008.

*Id.* The subpoenas also requested that Company X provide a completed custodian of records form for documents responsive to each subpoena. *Id.*

Company X provided documents responsive to Subpoenas One and Two; however, they did not complete the requested custodian of records forms. *Id.* at 3. No documents were produced in response to Subpoena Three, which requested materials identifying the owner of Company X. *Id.* Lastly, Company X responded to Subpoena Four by providing only records for sales made in the District of Columbia and redacting the names of the customers from those records. *Id.*

After first discussing the standards for quashing a subpoena, this memorandum and order addresses Company X's refusal to provide custodian of records forms, *infra* Part III, and then evaluates the company's refusal to comply with Subpoenas Three and Four, *infra* Parts IV and V respectively.

## II. STANDARD FOR QUASHING A GRAND JURY SUBPOENA

The grand jury's charge is to investigate whether a crime has been committed and to make any and all inquiries until it is satisfied one way or the

other. *United States v. R. Enterprises, Inc.*, 498 U.S. 292, 297 (1991). But the grand jury's "power is not unlimited." *United States v. Calandra*, 414 U.S. 338, 346 (1974). Its powers are constrained by any valid privilege, whether established by the Constitution, statute, or the common law. *Id.*; *see also Branzburg v. Hayes*, 408 U.S. 665, 688 (1972) ("Although the powers of the grand jury are not unlimited and are subject to the supervision of a judge, the longstanding principle that 'the public . . . has a right to every man's evidence,' *except for those persons protected by a constitutional, common-law, or statutory privilege*, is particularly applicable to grand jury proceedings.") (citations omitted) (emphasis added). A court may quash a subpoena where compliance would be unreasonable or oppressive. FED. R. CRIM. P. 17(c)(2). While what is reasonable depends on the context, it is clear that a subpoena may be quashed if it cannot withstand constitutional scrutiny. *R. Enters.*, 498 U.S. at 299; *In re Grand Jury, John Doe No. G.J. 2005-2*, 478 F.3d 581, 585 (4th Cir. 2007) (stating Rule 17(c) offers a vehicle for a subpoenaed party to assert a constitutional challenge). When deciding whether to quash a subpoena, it must be remembered, however, that a grand jury is presumed to act within the scope of its legitimate authority, absent a strong showing to the contrary. *R. Enters.*, 498 U.S. at 301 (citations omitted).

## III. CUSTODIAN OF RECORDS FORMS

The United States' motion seeks that Company X's custodian of records be required to qualify responsive documents as business records under Federal Rule of Evidence 803(6) by either completing a business records form or testifying

before the grand jury. The company's custodian of records, Mr. X—who is also the company's sole shareholder and president—has invoked his Fifth Amendment right against self-incrimination as the basis for his refusal to complete the forms. *Response* at 10.

A corporation itself has no Fifth Amendment privilege. *Braswell v. United States*, 487 U.S. 99, 104–105 (1987). As an extension of this rule, a company's custodian of records may not resist a subpoena to the company by invoking his own Fifth Amendment privilege. *Id.* at 117. The conflict between the custodian's individual privilege and the company's lack of privilege has several consequences, some more farcical than others. For example, while the government may not use the custodian's act of production against the custodian himself, the *company's* act of production may be used against the custodian—even though they are one in the same absent this legal fiction. *Id.* at 118. And because production of the documents may be compelled against the custodian, several courts have held that some (very) limited testimony may also be compelled if it is auxiliary to the act of production. *See Curcio v. United States*, 354 U.S. 118, 125 (1957); *In re Grand Jury Empaneled on Apr. 6, 1993*, 869 F. Supp. 298, 301 (D.N.J. 1994); *see also In re Grand Jury Proceedings*, 473 F. Supp. 2d 201, 205 (D. Mass. 2007). The Supreme Court has explained:

> The custodian's act of producing books or records in response to a subpoena duces tecum is itself a representation that the documents produced are those demanded by the subpoena. Requiring the custodian to identify or authenticate the documents for admission into evidence merely

4

makes explicit what is implicit in the production itself. The custodian is subjected to little, if any, further danger of incrimination.

*Curcio*, 354 U.S. at 125; *see also Braswell v. United States*, 487 U.S. 99, 114 (1988). The D.C. Circuit has elaborated that "although an officer who produces books and records may be required to produced 'auxiliary information,' such as authentication of the items produced, this doctrine is sharply limited to information which creates no danger of incrimination." *Communist Party v. United States*, 331 F.2d 807, 813 (D.C. Cir. 1963).

As such the Court must consider whether completing the custodian of records forms is auxiliary to the act of production and whether doing so would create any further danger of incrimination. Two courts have held that a custodian may not be compelled to complete such forms over the assertion of his Fifth Amendment rights, *see In re Grand Jury Proceedings*, 473 F. Supp. 2d 201; *In re Grand Jury Empaneled on Apr. 6, 1993*, 869 F. Supp. 298, while one court has that custodian may be so compelled, *see In re Trial Subpoena Duces Tecum*, 927 F.2d 244 (6th Cir. 1991).

Although the Supreme Court has held that a custodian may be compelled to authenticate documents, *Curcio*, 354 U.S. at 125, qualifying documents under Rule 803(6) entails more than just authentication. Authentication is merely a condition precedent for admissibility, whereas qualifying a document as a business record establishes both admissibility as well as authenticity. *Compare* FED. R. EVID. 803(6) *with* FED. R. EVID. 901; *see also In re Grand Jury Empaneled on*

5

*Apr. 6, 1993*, 869 F. Supp. at 304. Mr. X, if called on solely to authenticate the documents, would only be required to state that the documents that have been produced are those responsive to the subpoena. This testimony, by itself, would merely make explicit what was implicit in the production of the documents and as such it is auxiliary to the act of production. *See Curcio*, 354 U.S. at 125. Requiring Mr. X to qualify the documents as business records would involve far more, and likely poses a danger of self-incrimination. If compelled, Mr. X would have to testify about Company X's business practices, that the records were made at or near the time of the events they record, and by or from a person with knowledge of the events recorded therein. *See* FED. R. EVID. 803(6). None of that testimony is implicit in the act of production, *see Curcio*, 354 U.S. at 125, nor is it clear that it would not be incriminatory.[2] One of the district courts that quashed such a subpoena did so relying on this rationale. *In re Grand Jury Empaneled on Apr. 6, 1993*, 869 F. Supp. at 306. The other did so solely on the ground that business records testimony was not implicit in the act of production. *In re Grand Jury Proceedings*, 473 F. Supp. 2d at 201.

One court, however, has held that a custodian may be compelled to qualify subpoenaed documents as business records. *In re Trial Subpoena Duces Tecum*, 927 F.2d at 251 [hereinafter *Variety Distributing*]. The *Variey Distributing* court seized on language from *Curcio* that seemed to contemplate admissibility rather

---

[2] Indeed, given the possible offenses being investigated, this would likely amount to a confession if an indictment were returned.

than just authentication. *Id.* at 248. Indeed, the *Curcio* court did say that a custodian may be compelled to *"authenticate the documents for admission into evidence," Curcio*, 354 U.S. at 125. But all documents must be authenticated before they can be admitted into evidence. FED. R. EVID. 901. And when read in context, it is clear that *Curcio* only contemplates testimony that "makes explicit what is implicit in the production itself" and creates "little, if any, further danger of incrimination." 354 U.S. at 125. While one cannot overlook the *"for admission into evidence"* language, it cannot be read out of context either. And the context makes clear that testimony that is not making explicit what was implicit in production is impermissible. Furthermore, because authentication is a predicate for admission, limiting testimony that may be compelled to authentication alone is consistent with *Curcio*.

There are some additional reasons to be wary of compelling Mr. X to testify, as it is not clear what purpose (at least at this stage) would be served by compelling Mr. X to qualify responsive documents as business records. There is no prohibition against presenting hearsay to the grand jury; in fact, it is explicitly permitted. FED. R. EVID. 1101(d)(2) ("The rules (other than with respect to privileges) do not apply [to] [p]roceedings before grand juries."); *see also R. Enters.*, 498 U.S. at 298 ("[M]any of the rules and restrictions that apply at a trial do not apply in grand jury proceedings. This is especially true of evidentiary restrictions."); *United States v. Calandra*, 414 U.S. 338, 343 (1974) (stating that

7

the grand jury's "operation generally is unrestrained by the technical and evidentiary rules governing the conduct of criminal trials.").

Compelling Mr. X to provide Rule 803(6) testimony or complete the custodian of records form would violate his Fifth Amendment right by requiring him to provide testimony that is not auxiliary to the act of production, and as such he may not be compelled to do so. Furthermore, though the documents provided in response to the grand jury's subpoenas have already been authenticated, *see Curcio*, 354 U.S. at 125, Mr. X may still be properly required to identify the documents produced as those responsive to the subpoena, but no more. Accordingly, the United States' motion is denied to the extent that it seeks to compel Company X's custodian of records to provide Rule 803(6) testimony or complete custodian of records forms regarding documents responsive to the grand jury's subpoenas.

## IV. SUBPOENA THREE

Subpoena Three seeks "a copy of records identifying the true name(s) and alias(es) of the owner(s) of Company X from its date of incorporation up to and including June 2008." In its response Company X asserts that the United States already possesses records identifying Company X's owner from a prior investigation. *Response* at 2. Company X also concedes that the information in those records is still correct and that Mr. X continues to be the sole owner of Company X. *Id.* at 3. But still, those records are only current through 2007 and the subpoena seeks records through June 2008.

Rule 17(e) only allows a subpoena to be quashed if it violates a constitutional, statutory, or common law privilege or if it is unreasonable or oppressive. *Calandra*, 414 U.S. at 346. Company X has not identified why this subpoena would run afoul of Rule 17(e), and it hardly seems that requiring them to provide updated corporate records would be unreasonable or oppressive. *See R. Enters.*, 498 U.S. at 299 (stating reasonability depends on context). Since Company X has provided no grounds on which Subpoena Three may be properly quashed, compliance should be compelled. Therefore, the United States' motion to compel production of documents responsive to Subpoena Three is granted.

## V. SUBPOENA FOUR

In its motion to compel the United States asserts that Company X has failed to comply with Subpoena Four by redacting customer names from the records it provided and furthermore by only providing records for sales made in the District of Columbia. *Motion* at 3. (The United States has since limited its request under Subpoena Four for information about sales outside the District of Columbia to only seek the city and state where shipments were made and not the names of customers. *Reply* at 4.) Until the United States proves otherwise, the expressive materials being investigated are presumptively protected by the First Amendment and Company X's customers have a correlative right to receive that information

anonymously.[3] Until the United States proves that the materials are obscene, it will need to demonstrate both a compelling interest in the sought-after materials and a sufficient nexus between the information sought and the grand jury's investigation in order to obtain the redacted information.

*A. The materials the grand jury seeks are presumptively protected by the First Amendment.*

Though obscene materials are not protected by the First Amendment, *Ashcroft v. ACLU*, 535 U.S. 564, 574 (2002) (citing *Roth v. United States*, 354 U.S. 476, 484–85 (1957)), sexual expression that is not obscene is protected, *Sable Commc'ns of California, Inc. v. FCC*, 492 U.S. 115, 126 (1969).[4] Furthermore, expressive materials are entitled to presumptive First Amendment protection. *Cf. Fort Wayne Books, Inc. v. Indiana*, 489 U.S. 46, 63 (1989); *see Boggs v. Merletti*, 987 F. Supp. 2d 1, 6 n.2 (D.D.C. 1997); *see also In re Subpoena Duces Tecum*, 829 F.2d 1291, 1296 n.5 (4th Cir. 1987). The Government's briefing assumes that the films being investigated by the grand jury are obscene, and therefore that they

---

[3] Though neither party has raised the issue, the Court notes that Company X has standing to challenge the subpoena on behalf of its customers. *Virginia v. American Booksellers Ass'n*, 484 U.S. 383, 392–393 (1988).

[4] Deciding what materials are obscene, and therefore not protected by the First Amendment, has proved a difficult task. *Ashcroft v. ACLU*, 535 U.S. at 574. Accordingly, courts have emphasized the need to proceed cautiously when tackling obscenity questions as "[t]he line between speech unconditionally guaranteed and speech which may be legitimately regulated, suppressed, or punished is finely drawn." *Marcus v. Search Warrant*, 367 U.S. 717, 730–31 (1961) (quoting *Speiser v. Randall*, 357 U.S. 513, 525 (1958)). In several cases involving the seizure of allegedly obscene materials, courts have emphasized the need for additional procedural safeguards to protect First Amendment rights. *See id.*; *see also Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 66 (1963) ("Our insistence that regulations of obscenity scrupulously embody the most rigorous procedural safeguards . . . [is] but a special instance of the larger principle that the freedoms of expression must be ringed about with adequate bulwarks.").

are not entitled to First Amendment protection. However, as of yet there has been no judicial determination that the films being investigated are in fact obscene. As such they are entitled to the protection of the First Amendment.

A corollary First Amendment right is the right to receive ideas. "It is now well established that the Constitution protects the right to receive information and ideas . . . . This right to receive information and ideas, regardless of their social worth, is fundamental to our free society." *Stanley v. Georgia*, 394 U.S. 557, 564 (1969) (citations omitted); *see also Kleindienst v. Mandel*, 408 U.S. 753, 762 (1972); *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 65 n.6 (1963) ("The constitutional guarantee of freedom of the press embraces the circulation of books as well as their publication."). Here if the subpoenaed customer records are given to the Government, it could have a chilling effect on the exercise of Company X's customers' First Amendment rights. As Justice Douglas once wrote "[a] requirement that a publisher disclose the identity of those who buy his books, pamphlets, or papers is indeed the beginning of surveillance of the press . . . . Once the government can demand of a publisher the names of the purchasers, the free press as we know it disappears . . . the purchase of a book or pamphlet today may result in a subpoena tomorrow." *United States v. Rumley*, 345 U.S. 41, 47 (1953) (Douglas, J., concurring). This Court has once before recognized the First Amendment implications of a subpoena for such records. *See In re Grand Jury Subpoena to Kramerbooks & Afterwords, Inc.*, Nos. 98-MC-135-NHJ, 98-MC-138-NHJ, 26 Med. L. Rptr. 1599, 1600 (D.D.C. Apr. 6, 1998); *see also In re*

11

*Grand Jury Subpoena to Amazon.com dated Aug. 7, 2006*, 246 F.R.D. 570, 572 (W.D. Wis. 2007) ("This presents a legitimate First Amendment concern. The subpoena is troubling because it permits the government to peek into the reading habits of specific individuals without their prior knowledge or permission."). Because the subpoena seeks records of customer purchases of expressive materials, which are presumptively protected by the First Amendment, the records are presumptively protected as well. Therefore, the United States may only obtain the records if it demonstrates a compelling need for them and a sufficient nexus between the records and the grand jury's investigation, or if it shows that they are not entitled to the protection of the First Amendment, which it has not attempted to do.

B. Standard of Review

In *Branzburg v. Hayes*, the Supreme Court stated "[w]e do not expect courts will forget that grand juries must operate within the limits of the First Amendment. . . ." 408 U.S. at 708. This Court has not forgotten. But it also remembers that while the First Amendment generally restricts government from regulating expression, it is not absolute. *Ashcroft v. ACLU*, 535 U.S. at 573. And despite its admonition in *Branzburg*, the Supreme Court has yet to define the appropriate standard for reviewing grand jury subpoenas that implicate First Amendment concerns. *Amazon.com*, 246 F.R.D. at 572. However, several courts of appeal, in addition to this Court, have adopted a two-part test to determine whether to enforce a subpoena that may infringe on First Amendment rights. *See*

12

*In re Grand Jury Subpoena Duces Tecum*, 78 F.3d 1307, 1312 (8th Cir. 1996); *In re Grand Jury Proceedings*, 776 F.2d 1099, 1102–1103 (2d Cir. 1985); *Kramerbooks* 26 Med. L. Rptr. at 1600. In order to survive a First Amendment challenge the government must show that they have a compelling interest in obtaining the sought-after material and that there is a sufficient nexus between the subject matter of the investigation and the information they seek. *Kramerbooks*, 26 Med. L. Rptr. at 1601.

The United States argues that the *Kramerbooks* standard is not appropriate and that this Court should instead "balance the government's need for documents against the possible constitutional infringement . . . without placing any special burden on the government." *Reply* at 3 (citing *In re Grand Jury 87-3 Subpoena Duces Tecum*, 955 F.2d 229, 234 (4th Cir. 1992)). To support its position the United States claims that the Supreme Court has twice declined to apply the substantial relationship test in cases where subpoenas implicating First Amendment interests were challenged. *Id.* (citing *Pennsylvania v. EEOC*, 493 U.S. 182 (1990) and *Branzburg v. Hayes*, 408 U.S. 665). This reading of Supreme Court precedent is incorrect though, because neither case held a First Amendment right was implicated by the subpoenas being reviewed, and as such neither court considered whether the substantial relationship would be the appropriate standard of review for a subpoena implicating First Amendment interests. *See Pennsylvania v. EEOC*, 493 U.S. at 199 ("[W]e think the First Amendment cannot be extended to embrace petitioner's claim."); *id.* at 201 ("Because we conclude

that the EEOC subpoena process does not infringe any First Amendment right enjoyed by petitioner, the EEOC need not demonstrate any special justification to sustain the constitutionality of Title VII as applied to tenure peer review materials . . . ."); *Branzburg*, 208 U.S. at 708 ("If there is no First Amendment privilege to refuse to answer the relevant and material questions asked during a good-faith grand jury investigation, then it is *a fortiori* true that there is no privilege to refuse to appear before such a grand jury until the Government demonstrates some 'compelling need' for a newsman's testimony."). As such *Pennsylvania v. EEOC* and *Branzburg v. Hayes* are inapposite as neither had occasion to fashion a test, given that neither case found a First Amendment right was implicated by the challenged subpoenas. One court has repeated this mistaken assumption that the Supreme Court had twice declined to apply the substantial relationship test, which perhaps explains some of this confusion. *See In re Grand Jury 87-3*, 955 F.2d at 234 (citing *Pennsylvania v. EEOC*, 493 U.S. 182 and *Branzburg*, 408 U.S. 665). And while that court adopted the test advocated by the government, it also did so after concluding that the case before it was "not a case in which First Amendment rights are implicated." *Id.* at 234. Because actual First Amendment rights are implicated in this case, unlike in any of the three cases cited by the United States, this Court declines to adopt that position, and instead chooses to follow the test enunciated in *Kramerbooks* and *Amazon.com*.

14

*C. Has the Government met its burden?*

In addition to several other obscenity statutes, the grand jury is investigating a possible violation of 18 U.S.C. § 1466, which criminalizes the interstate or foreign shipment of obscene materials by those persons engaged in the business of producing obscene material with intent to distribute or sell, or engaged in the business of selling or transferring obscene materials.[5] The statute creates a presumption that a person is "engaged in the business" if a person offers two or more copies of any obscene materials or a total of five or more obscene materials for sale or transfer at any one time. 18 U.S.C. § 1466(b). The Government contends that in order to trigger this presumption "proof of multiple sales must be given." *Reply* at 3. The United States does not, however, demonstrate how the subpoenaed records fail to establish proof of multiple sales and Company X even concedes that the redacted records demonstrate a sufficient number of sales to trigger the presumption (though it denies that the materials sold are obscene). *Response* at 9. Company X also points out that the undercover agent could have purchased two copies of the same title or five copies of different titles to gather enough proof to trigger the presumption. *Id.* (Indeed, two of the records show that five titles were purchased at the same time, which should itself be enough to trigger the presumption, assuming that all of those titles are shown to be obscene.) Still it should be noted that the United States does not need this

---

[5] The United States' briefs only address the reasons why the subpoenaed materials would assist with the grand jury's investigation of a possible violation of 18 U.S.C. § 1466. As a consequence this Court only analyzes the reasons the Government offered in its briefs.

presumption to prove its case, it merely needs to show that the distributor is "engaged in the business" which means that "the person who produces[,] sells or transfers or offers to sell or transfer obscene material devotes time, attention, or labor to such activities, as a regular course of business, with the objective of earning a profit . . . ." 18 U.S.C. § 1466(b). What the names of the customers who made these purchases have to do with this presumption is unclear to this Court, and since the records produced by Company X already go towards establishing the presumption, the United States' proffered reason is not compelling.

The United States also argues that its agent does not have a First Amendment right at stake, and as a result there is no basis for redacting the agent's name from the records provided in response to the subpoena. *Reply* at 4. But because providing Company X with the agent's name would break the secrecy of the grand jury's investigation, *id.*, it would prefer that this Court order all three responsive records to be turned over unredacted. Here the three records that are responsive to the subpoena are each unique. And because the responsive records are receipts, presumably an unredacted copy of the agent's receipt is already in the grand jury's possession. Even if one is not, it should not be all that difficult for the United States to pick out which records correspond to their agent's purchases since no two titles purchased are the same.

That so few records are at issue also undercuts the Government's argument that breaking grand jury secrecy here would result in the sort of broad disclosure that would "afford[] the targets of the investigation far more information about the

grand jury's internal workings than the Federal Rules of Criminal Procedure appear to contemplate." *R. Enters.*, 498 U.S. at 299. The three subpoenaed receipts only record the purchase of seven films. And since no two titles purchased are the same, the only way the Government could have gathered enough evidence to establish the presumption that Company X was engaged in the business of distributing and selling obscene materials would have been by showing that Company X offered five or more copies of an obscene movie at one time. *See* U.SC. § 1466(b). One needn't be Sherlock Holmes to deduce which records go towards establishing the presumption, as only two receipts show a combination of five titles being sold at one time. Because disclosure of which purchases were made by the undercover agent would not allow Company X to peer into the inner workings of the grand jury, the Government's rationale for why the Court should order disclosure as to all the records is not compelling.

But that is still just conjecture; the Government might not have purchased five titles in its investigation. The grand jury may not be investigating all the titles in Company X's catalog or all those sold in the District of Columbia. Indeed, it is implied that they are not. *See Reply* at 4 ("If the FBI agent's name is the only name turned over, then Company X will know precisely the matter being investigated, including the *specific movies* the grand jury is considering for possible prosecution. . . .") (emphasis added). Even if the government proves the titles the grand jury is investigating are obscene the subpoena still faces a problem of over breadth. *See NAACP v. Alabama*, 377 U.S. 288, 307 (1964) ("A

17

governmental purpose to control or prevent activities constitutionally subject to state regulation may not be achieved by means which sweep unnecessarily broadly and thereby invade the area of protected freedoms."). Should the Government prove at trial that the titles it is investigating are obscene, any remaining titles Company X has sold in the District of Columbia are still entitled to First Amendment protection. And customers who purchased those titles would still enjoy a presumptive First Amendment right to receive them anonymously. This Court does not know which titles were purchased by the government agent, nor does it know how many purchases the agent made. Revealing all the customer names here to protect the government's minimal interest in grand jury secrecy would prove too much as it might infringe on the legitimate First Amendment interests of Company X's customers. Because the subpoena here is overbroad, and would infringe upon legitimate First Amendment rights, it will not be enforced as written.

Because none of the government's proffered reasons for ordering Company X to comply with the subpoena are compelling, the United States' motion to compel is denied as to the unredacted records of purchases made in the District of Columbia.

*D. Records of Sales Made Outside the District of Columbia*

Subpoena Four originally sought not only those records of sales made in the District of Columbia, but also records of all sales made during the relevant time periods anywhere. The United States has since limited its request under Subpoena

18

Four for information about sales outside the District of Columbia to exclude the names of customers. *Reply* at 4. Because the United States no longer seeks the names of customers who purchased materials from Company X, the First Amendment rights of Company X's customers are no longer implicated. Accordingly, the *Kramerbooks* standard of review is not appropriate for examining whether the grand jury is entitled to redacted customer records for purchases made outside the District of Columbia. Instead, the appropriate standard for review is that enunciated in *R. Enterprises*. When "a subpoena is challenged on relevancy grounds the motion to quash must be denied unless the district court determines that there is no reasonable possibility that the category of materials the Government seeks will produce information relevant to the general subject of the grand jury's investigation." *R. Enterprises*, 498 U.S. at 301. And although the First Amendment rights of Company X's customers are not implicated by these final records, the First Amendment, in particular the obscenity doctrine, still has a bearing on their relevance. And because of the patchwork nature of obscenity law, the Court is convinced that Company X has met the demanding *R. Enterprises* standard.

In developing a definition of obscenity the Supreme Court noted that "[i]t is neither realistic nor constitutionally sound to read the First Amendment as requiring that the people of Maine or Mississippi accept public depiction of conduct found tolerable in Las Vegas, or New York City." *Miller v. California*, 413 U.S. 15, 32 (1973). In *Miller* the Court "succeeded" in "defin[ing] what may

19

be indefinable." *Jacobellis v. Ohio*, 387 U.S. 184, 197 (Stewart, J., concurring).

*Miller* set out the following test for determining whether something was obscene:

> (a) whether 'the average person, applying contemporary community standards' would find that the work, taken as a whole, appeals to the prurient interest, (b) whether the work depicts or describes, in a patently offensive way, sexual conduct specifically defined by the applicable state law; and (c) whether the work, taken as a whole, lacks serious literary, artistic, political, or scientific value.

*Miller*, 413 U.S. at 24 (internal citations omitted). As implied by *Miller* what is constitutionally punishable in one jurisdiction might be constitutionally protected in another. This aspect of the test has been criticized as burdening publishers who choose "to send their products in interstate travel" by forcing them "to cope with the community standards of every hamlet into which their goods may wander." *Hamling v. United States*, 418 U.S. 87, 144 (1974) (Brennan, J., dissenting). While it is certainly a peculiar constitutional doctrine that protects a film's distribution in one place but allows it to be punished in another, the "variegated standards" the *Miller* test creates have consequences for prosecutors and grand juries as well.

The charge of the grand jury is to investigate crimes committed within the district where it sits. *See* 18 U.S.C. § 3332 ("It shall be the duty of each such grand jury impaneled within any judicial district to inquire into offenses against the criminal laws of the United States alleged to have been committed within that district."). Sometimes crimes committed in other districts will have a bearing on such an investigation and will help the grand jury investigate crimes committed in

its district. For example, understanding how a drug trafficking network operates in other places might help a grand jury determine how that network distributes drugs in its own district. But distributing narcotics is illegal whether in Washington, D.C. or Boise, Idaho. Pornography is different because its distribution is only criminal if it is obscene or if it involves the exploitation of minors. And what is obscene, and therefore cannot be distributed legally, can vary from place to place. This is because fact finders have to apply "contemporary community standards" to determine whether the materials distributed are obscene and in this they are limited to applying the standards of their own community. It would violate due process for a fact finder in one place to determine that Company X had distributed obscene materials in some other community, where the threshold for obscenity might be higher. Indeed, the distribution of pornography from the San Fernando Valley to just across the Potomac in Virginia could be perfectly legal and constitutionally protected; even though those same materials might be found to be obscene in Washington, which would make their distribution here illegal.

The grand jury investigating Company X is similarly limited to using its members' sense of this community's standards to determine whether there is probable cause to believe that the materials being distributed *here* are obscene. Company X's distribution of pornography in other communities has no relevance to this determination. While grand juries investigatory powers are broad, they are not licensed to engage in fishing expeditions, *R. Enterprises*, 498 U.S. at 299, and

21

because of the geographic limitations of the *Miller* test, this search for records from outside the District of Columbia cannot be anything but. When some other grand jury thinks it necessary to begin an investigation of Company X's activities in its district, because it believes that Company X's films may be obscene under its community's standards, records of sales in that district would be relevant, but again only to that grand jury's investigation, not this one's.

Because expressive materials are presumptively protected by the First Amendment and a grand jury in the District of Columbia cannot apply community standards for any community other than its own, Company X's distribution of films outside the District of Columbia has no relevance to this grand jury's investigation, even if those same films distributed other places are later found to be obscene here. *See id.* As such, the United States' motion to compel production of sales records from outside the District of Columbia is denied.

## VI. CONCLUSION

For the reasons set for the above, it is hereby ordered that the United States' motion to compel the custodian of records of Company X to qualify responsive documents as business records under Rule 803(6) is DENIED;

It is further ordered that the United States' motion to compel the production of unredacted documents responsive to Subpoena Four is DENIED;

It is further ordered that the United States' motion to compel the production of documents responsive to Subpoena Four regarding transactions outside the District of Columbia is DENIED; and

22

It is further ordered that the United States' motion to compel the production of documents responsive to Subpoena Three is GRANTED, and that such documents shall be produced within ten days of this date.

**SO ORDERED** this ⎯⎯ day of July 2009.

ROYCE C. LAMBERTH
Chief Judge
United States District Court

*Redacted version filed 10/26/09*