Filed 4/26/13

**CERTIFIED FOR PARTIAL PUBLICATION\***

**IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA**

**FOURTH APPELLATE DISTRICT**

**DIVISION TWO**

| | |
|---|---|
| In re the Marriage of JESSIE A. and ROBERT S. KAHN. | |
| JESSIE A. KAHN,<br><br>        Respondent,<br><br>v.<br><br>ROBERT S. KAHN,<br><br>        Appellant. | E054082<br><br>(Super.Ct.No. IND097341)<br><br>**OPINION** |

APPEAL from the Superior Court of Riverside County.  Lawrence P. Best,

Temporary Judge (pursuant to Cal. Const., art. VI, § 21) and Dale R. Wells, Judge.[†]

Affirmed in part and reversed in part with directions.

Best Best & Krieger, Kira L. Klatchko and Douglas S. Phillips for Appellant.

Richard C. Houghton for Respondent.

---

    \*      Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this
opinion is certified for publication with the exception of parts I, II, and III.

    [†]      Judge Best granted the motion for terminating sanctions, entered the
default, and denied the motion to set aside the default.  Judge Wells presided over the
prove-up hearing and entered the default judgment.

1

In this dissolution of marriage proceeding, husband Robert Kahn failed to respond to discovery propounded by wife Jessie Kahn. Even after the trial court granted Jessie's motion to compel, he still failed to respond. Finally, after Jessie filed a motion for terminating sanctions, Robert served responses, but they included numerous objections based on the Fifth Amendment.

The trial court struck Robert's responsive pleading as a discovery sanction and entered his default. It also denied his motion to set aside the default. After a prove-up hearing, it entered a default judgment, which, among other things, awarded Jessie $275,000 against Robert for breach of fiduciary duty.

Robert now contends:

1. The trial court erred by striking Robert's responsive pleading and entering his default.

2. The trial court erred by denying Robert's motion to set aside the default to the extent that the motion was based on his attorney's affidavit of fault.

3. The award of $275,000 was not supported by substantial evidence.

4. The award of $275,000 exceeded the scope of the petition.

In the published portion of this opinion, we agree that the award of $275,000 rendered the judgment void, because Jessie's petition had not indicated that she was seeking any particular amount of damages for breach of fiduciary duty. In the unpublished portion, we find no other error. Hence, we will remand to the trial court with directions to determine whether to modify the judgment by striking the award of $275,000

2

or to vacate the judgment in its entirety so that Jessie can file an amended petition and seek damages for breach of fiduciary duty.

## I

## GENERAL FACTUAL AND PROCEDURAL BACKGROUND[1]

Jessie and Robert were married in 1958. In 2007, after 48 years of marriage, they separated. In 2009, Jessie filed the present dissolution proceeding. Robert filed a responsive pleading.

It was Jessie's understanding that Robert owned numerous parcels of real property, either directly or through various business entities. Robert claimed, however, that most of the properties had either been sold or were "owned and in the possession of . . . his girlfriend." He admitted having an interest — through business entities named Maverik Properties (Maverik) and The Beverly Building LLC — in a commercial building on Beverly Boulevard in Los Angeles. He claimed, however, that the building was operating at a loss and that his only income was $570 a month from Social Security.

On Jessie's motion, the trial court appointed a receiver. However, Robert failed to cooperate with the receiver and interfered with the receiver's management of the building.

---

[1] The factual and procedural matters in this part are included as general background. They have been gleaned from various portions of the record. They were not necessarily before the trial court when it made any particular ruling.

3

## II

## THE TRIAL COURT'S ORDER GRANTING TERMINATING SANCTIONS

Robert contends that the trial court erred by striking his responsive pleading and entering his default.

A. *Relevant Factual and Procedural Background.*

1. *The motion to compel.*

On April 23, 2009, Jessie served Robert with form interrogatories and a request for production of documents.

At the time, Robert was in propria persona. The next day, however, April 24, 2009, he retained Attorney Thomas M. Stefanelli. Nevertheless, on May 28, 2009, when responses were due (Code Civ. Proc., §§ 2030.260, subd. (a) [interrogatories], 2031.260, subd. (a) [document requests]; see also Code Civ. Proc., § 1013), Robert wholly failed to respond.

On June 16, 2009, Stefanelli belatedly requested an extension of time. He told Jessie's attorney, " . . . I will be meeting with my client on . . . June 18, 2009. I will be able to get you his responses to your discovery within a few days thereafter." However, he did not do so.

On July 14, 2009, Jessie filed a motion to compel.

On July 30, 2009, Attorney Stefanelli substituted out in favor of Robert, in propria persona.[2]

Robert did not file any opposition to the motion to compel. On August 19, 2009, the trial court granted the motion. It ordered Robert to respond within 30 days. It did not specifically state that the responses were to be without objection. However, Robert had already waived any objections by failing to serve a timely response. (Code Civ. Proc., §§ 2030.290, subd. (a) [interrogatories], 2031.300, subd. (a) [document requests].)

Robert did not respond by the date set by the trial court.

### 2. *The motion for terminating sanctions.*

#### a. *Jessie's motion.*

On December 1, 2009, Jessie filed a motion to strike Robert's responsive pleading as a discovery sanction.

On December 14, 2009, Attorney Bertrand Cottle substituted in as attorney for Robert.

On December 17, 2009, at a hearing, Cottle stated, " . . . I have Mr. Kahn working with my paralegal . . . to provide discovery responses . . . ." Based on that representation, Jessie's attorney agreed to continue the hearing on the motion for terminating sanctions.

---

[2]     Robert states that Jessie filed her motion to compel "[w]hile [Robert] was acting in propria persona . . . ." Not true. She filed it on July 14; Robert was not in propria persona until July 30. Even if we accept Robert's subsequent claim that he actually fired Stefanelli on July 24, the motion was still filed before Robert was in propria persona.

5

On April 13, 2010, however, Robert substituted Attorney B. Palmer Riedel in place of Attorney Cottle.

          b.     *The receivership.*

Meanwhile, on December 17, 2009, the trial court had appointed a receiver. On April 20, 2010, the receiver filed a report stating that Robert had failed to turn over business books and records, citing the Fifth Amendment and the right to privacy; he had failed to turn over business bank accounts; and he had interfered with the receiver's business relationships with employees and tenants.

          c.     *Robert's opposition.*

On April 23, 2010, Robert filed a declaration in opposition to the motion for terminating sanctions. In it, Robert noted that he had been in propria persona from July 25 through December 9, 2009, assertedly due to lack of funds.

He stated, "On or about July 4, 2009, I had a mishap falling down a set of stairs injuring my back which left me incapacitated for three to four weeks. It was actually not until approximately November 24, 2009 that I became ambulatory."

He also stated that the Internal Revenue Service had taken the position that he owed $250,000 in back taxes. He therefore claimed, " . . . I was faced with the . . . challenge of producing [discovery] responses that would threaten my constitutional rights to avoid possible self[-]incrimination with regard to the Internal Revenue Service."

Finally, Robert stated that in March 2010, Attorney Cottle had prepared responses and had had Robert verify them, but "for some reason," Cottle had not served them.

When Attorney Riedel realized this, he served the responses "immediately." However, Robert did not attach a copy of the responses.

        d.     *Jessie's reply.*

On April 29, 2010, Jessie filed a reply. She conceded that Robert had served discovery responses on April 20, 2010.[3] Unlike Robert, however, she attached a copy of the responses.

The responses were verified by Robert, and there was a signature block for Attorney Cottle. However, neither Cottle nor Riedel had actually signed them.

In response to 7 out of the 20 form interrogatories, Robert asserted his privilege against self-incrimination. This included interrogatories about whether he was living with anybody; whether he had any health, life, auto, or disability insurance; and whether he had received any gifts.

When Robert did not object, his responses were evasive. For example, he refused to state his residence address "for privacy and reasons of personal safety." When asked his income, he stated that he received $577 from Social Security, then added cryptically, "Beverly Bldg. (See court appointed receiver.)" When asked about attorney fees he had incurred and paid, he stated only, "Per attorney fee agreement."

---

      [3]     At that point, the hearing on the motion for terminating sanctions was set for May 6, 2010. It was later further continued to July 15, 2010.

Robert also asserted his privilege against self-incrimination in response to 23 out of the 43 document requests, including requests for life insurance policies and corporate articles, by-laws, and minutes.

In response to nearly all the other requests, Robert claimed that he had no responsive documents. This included the requests for documents pertaining to attorney fees, documents pertaining to the community or separate property nature of any property, and documents pertaining to litigation.

Robert agreed to produce one document in response to one request.

e.      *Robert's further opposition.*

On May 14, 2010, Robert filed a memorandum of points and authorities in opposition to the motion for terminating sanctions. It argued that: (1) Jessie's motion had not been supported by a declaration or other evidence; (2) Robert "had valid reasons for not timely producing the discovery"; (3) Robert had now responded to the requests; and (4) terminating sanctions would violate due process.

f.      *The order granting the motion.*

On July 15, 2010, the trial court granted the motion. It found that "there ha[d] been a total lack of cooperation by [Robert] as documented by [Jessie's attorney's] paperwork and as documented by the receiver[']s paperwork." (Capitalization omitted.)

B.      *Analysis.*

Standard civil discovery procedures (see generally Code Civ. Proc., § 2016.010) apply in family law proceedings. (Hogoboom & King, Cal. Practice Guide: Family Law

8

(Rutter Group 2012) ¶ 11:110, pp. 11-30 to 11-30.1.)  Under these provisions, if a party

fails to obey an order compelling a response, the trial court "may make those orders that

are just," including an order striking the party's pleadings.  (Code Civ. Proc.,

§§ 2030.290, subd. (c) [interrogatories], 2031.300, subd. (c) [document requests]; see also

*id*., § 2023.030, subd. (d)(1).)

"[T]erminating sanctions are to be used sparingly, only when the trial court

concludes that lesser sanctions would not bring about the compliance of the offending

party."  (*R.S. Creative, Inc. v. Creative Cotton, Ltd.* (1999) 75 Cal.App.4th 486, 496.)

However, while "the ultimate sanction of default is a drastic penalty which should be

sparingly used, the unsuccessful imposition of a lesser sanction is not an absolute

prerequisite to the utilization of the ultimate sanction; and the test on appeal is whether

the lower court abused its discretion on the particular facts before it.  [Citation.]"

(*Housing Authority v. Gomez* (1972) 26 Cal.App.3d 366, 371.)

It must be remembered that Robert did not provide *any* responses until a year after

the original request, which was six months after he had been ordered to do so and two

weeks before the date of a hearing on terminating sanctions (later continued).  He simply

blew off the discovery process.

Robert now complains that he was in propria persona for part of this time.

However, from April 24, 2009, the day after the discovery was served, through June 25,

2009, when his responses were due — a period of two months — he had counsel.

Moreover, from December 14, 2009, when he retained Attorney Cottle, through April 20,

2010, when he finally served a response — a period of four months — he again had counsel. Thus, there is absolutely no excuse for his complete inaction over a total of six months. In any event, his propria persona status is irrelevant. "[S]elf-represented parties are entitled to no greater consideration than other litigants and attorneys [citation]." (*In re Marriage of Falcone & Fyke* (2008) 164 Cal.App.4th 814, 830.)

Robert also complains that he was injured for part of this time. Again, however, he was "incapacitated" for less than a month and not "ambulatory" for only about five months. In fact, his nonambulatory period (July-November 2009) and his propria persona period (July-December 2009) more or less coincided, leaving him with ample time to respond. And, again, his injury is largely irrelevant. If, in fact, it made it difficult for him to respond, he should have sought an extension of time, a protective order, or similar relief. He should not have exercised self-help by unilaterally postponing a response. (See *Doe v. United States Swimming, Inc.* (2011) 200 Cal.App.4th 1424, 1439.)

Next, Robert complains that Jessie's requests were supposedly numerous and sweeping. Robert, however, had a fiduciary duty of full disclosure regarding all community assets and liabilities (Fam. Code, § 1100, subd. (e)); he admitted that he had no separate property. Jessie used form interrogatories. Her requests do not strike us as burdensome or oppressive in connection with a marriage of nearly 50 years. A couple of months should have been plenty of time to respond. And, again, if it was not, Robert should have sought an extension.

10

Admittedly, while the motion for terminating sanctions was pending, Robert did serve purported responses.  He therefore argues that the motion should have been denied as moot; if Jessie found the responses inadequate, she should have been required to file a new motion to compel, including a new "meet and confer" declaration and a new separate statement.

Responses that include objections, however, must be signed by an attorney.  (Code Civ. Proc., § 2030.250, subd. (c) [interrogatories]; 2031.250, subd. (c) [document requests].)  Here, the responses were not signed by an attorney, even though they contained objections.  For this reason alone, the trial court could properly disregard the responses as invalid.

But even assuming the responses were valid, the motion was not moot.  It was a motion for sanctions, not a motion to compel.  Robert had violated a court order to act by a certain deadline.  Hence, the trial court was empowered to impose sanctions.  The fact (if it was a fact) that he complied after the deadline was relevant to the choice of a particular sanction, but it did not make the motion for sanctions moot.

Robert asserts that "striking a responsive pleading and entering a default is a punitive sanction where responses have been provided."  However, the case that he cites for this proposition, *McGinty v. Superior Court* (1994) 26 Cal.App.4th 204, says nothing of the kind.  It simply states, generally, that "'[t]he penalty should be appropriate to the dereliction, and should not exceed that which is required to protect the interests of the party entitled to but denied discovery.' [Citation.]" (*Id*. at p. 211.)  It also states, again

11

generally, that "punishment is not an appropriate aim of discovery sanctions. [Citations.]" (*Id*. at p. 214.) It does not state that terminating sanctions are necessarily excessive merely because some responses have been provided.

The trial court could also consider the adequacy of the belated responses. Robert's position, taken to its logical extreme, is that if he served any response, even to just one interrogatory, Jessie had to file a new motion to compel, followed by a new motion for sanctions; and then, if he answered just one more interrogatory before the second motion for sanctions was heard, Jessie (and the trial court) had to go through the whole process again. Obviously, this is absurd.

Robert's responses were grievously defective. First and foremost, he had no right to raise *any* objections. If a party fails to serve a timely response, that party waives "any objection . . . , including one based on privilege . . . ." (Code Civ. Proc., §§ 2030.290, subd. (a) [interrogatories], 2031.300, subd. (a) [document requests].) Robert claims he was unaware of this because, back in August 2009, when the trial court granted the motion to compel, he was in propria persona, and the trial court did not specify that the responses were to be without objections.[4] By March 2010, however, when Attorney Cottle drafted the responses, and by April 2010, when Attorney Riedel served them, that had long ceased to be an excuse.

---

**4** Robert did not say in his declaration that this was actually his reason for asserting objections; it is merely a speculative inference that he now asks us to draw.

12

In addition, at least some of Robert's Fifth Amendment objections appear invalid on their face. These include his objections to whether he was living with anyone and to whether he had any insurance. In an income and expense declaration filed around the same time, he disclosed without objection that he was living with a named female "companion" and that he was not paying for insurance (other than health insurance).

His Fifth Amendment objections[5] to producing corporate and partnership business records were invalid because "an individual cannot rely upon the privilege to avoid producing the records of a collective entity which are in his possession in a representative capacity, even if these records might incriminate him personally." (*Bellis v. United States* (1974) 417 U.S. 85, 88 [94 S.Ct. 2179, 40 L.Ed.2d 678]; see also *Braswell v. United States* (1988) 487 U.S. 99, 102-118 [108 S.Ct. 2284, 101 L.Ed.2d 98].) This rule applies even to closely held and one-person corporations. (*In re Grand Jury Subpoena Issued June 18, 2009* (2d Cir. 2010) 593 F.3d 155, 158-159; *Amato v. United States* (1st Cir. 2006) 450 F.3d 46, 52; *U.S. v. Stone* (4th Cir. 1992) 976 F.2d 909, 912.)

Robert's responses failed to identify the documents that he objected to producing, as required. (Code Civ. Proc., § 2031.240, subd. (b).) And finally, out of the handful of responses that he did provide, many were evasive and incomplete.[6]

---

[5]    Robert did not assert any state-law privilege against the disclosure of tax returns; thus, he forfeited any such privilege (if he had not done so already).

[6]    Robert argues that he had actually produced at least some documents. No *evidence* of this, however, was before the trial court when it ruled on the motion for

*[footnote continued on next page]*

13

It was reasonably inferable that Robert's attorneys *knew* the responses were defective. According to Robert's opposition, the responses had been prepared by Attorney Cottle, but not served; when Attorney Riedel found them in the file, he served them "immediately." This account, however, was not supported by any declaration. In any event, it failed to explain *why* Cottle did not serve the responses. It also failed to explain *why* Riedel did not sign them. This procedure rather neatly allowed both attorneys to avoid any responsibility for the content of the responses. If Riedel was willing to serve them, he should have signed them; if he was not willing to sign them, he should not have served them. There was ample evidence that Robert and his attorneys were playing fast and loose with the court.

Based on the foregoing, the trial court could reasonably conclude that the violation was willful and that no lesser sanction was going to be successful in obtaining compliance.

Finally, Robert argues that the trial court erred by considering his failure to cooperate with the receiver. Jessie's counsel argued that Robert had failed to produce documents not only to Jessie, but also to the receiver. He also argued that Robert had interfered with the receivership by telling tenants to pay rent to him. The trial court

---

*[footnote continued from previous page]*
terminating sanctions. He introduced this evidence later, in support of his motion to set aside the default. (See part III, *post*.)

indicated that its finding of "a total lack of cooperation" was based not only on Jessie's "paperwork," but also on "the receiver[']s paperwork."

Robert, however, did not raise this contention below. Thus, he forfeited it. Certainly his failure to cooperate with the receiver was *relevant*. "[T]he sanctioned party's history as a repeat offender is not only relevant, but also significant, in deciding whether to impose terminating sanctions. [Citations.]" (*Liberty Mutual Fire Ins. Co. v. LcL Administrators, Inc.* (2008) 163 Cal.App.4th 1093, 1106.) Absent any more particular objection, the trial court could properly take into account Robert's recalcitrance in dealing with the receiver.

## III

## THE TRIAL COURT'S REFUSAL TO SET ASIDE THE DEFAULT

Robert contends that the trial court erred by denying his motion to set aside the default.

A. *Additional Factual and Procedural Background*.

On July 28, 2010, Robert filed a motion to set aside the default. In it, he raised multiple arguments.

First, he argued that terminating sanctions were disproportionate and punitive.

Next, he argued that, on the motion for terminating sanctions, Jessie's reply had included new arguments and evidence that had not been in her original motion, and the trial court should not have considered these. He asserted that, "if it was inclined to

15

consider those issues, the court should have continued the hearing to give [Robert] an opportunity to brief those issues . . . ."

Moreover, he argued that, at the hearing on the motion for terminating sanctions, Jessie's counsel had stated, falsely, that Robert had not produced any documents; actually, Robert claimed, he had produced 434 pages of documents.

Finally, Robert argued that the trial court should grant relief because Attorney Riedel had:

1. Failed to sign Robert's discovery responses;

2. Served responses that included Fifth Amendment objections;

3. Failed to argue that Jessie's reply included new arguments and evidence; and

4. Failed to request a continuance.

The motion was supported by a declaration by Riedel. Riedel stated that he had produced 434 pages of documents relating to the Beverly Building to both Jessie and the receiver; he attached the documents.[7]

Riedel claimed that he did not sign the discovery responses "because they were prepared by Mr. Cottle."

Riedel also claimed that he "decided to leave the [Fifth Amendment] objections" because the trial court's order compelling responses had not "expressly" prohibited objections.

---

[7] By our count, there are 229 pages of documents, not 434.

Riedel conceded that he had not "expressly" argued that Jessie's reply included new arguments and evidence. He explained: " . . . I did not expect the court to consider numerous new factual and legal arguments raised for the first time in the [r]eply and at the hearing. It was my understanding that since [Robert] had, in fact, provided discovery responses and documents the issue of [t]erminating [s]anction[s] . . . was moot."

Riedel also conceded that he had not "expressly" requested a continuance.

After hearing argument the trial court denied the motion. Jessie's counsel argued that, if the trial court were to "just make a further order that [Robert] do things, . . . we are just going to be back here again." The trial court replied, "I know. He has had the chance to comply. So making another order, I agree with you." It concluded: "I think the failure to turn over the material was willful. I think it's been a pattern of noncooperation designed to frustrate the process. Based on that I don't believe there is another appropriate sanction, and the motion will be denied."

B.      *Analysis*.

Code of Civil Procedure section 473, subdivision (b) allows the trial court to relieve a party from a default. "'"[T]he provisions of section 473 of the Code of Civil Procedure are to be liberally construed and sound policy favors the determination of actions on their merits." [Citation.]' [Citation.] '[B]ecause the law strongly favors trial and disposition on the merits, any doubts in applying section 473 must be resolved in favor of the party seeking relief from default.' [Citation.]" (*Maynard v. Brandon* (2005) 36 Cal.4th 364, 371-372.)

17

There are two alternative grounds for relief from default, one mandatory, one discretionary.

Under the discretionary provision, the court "may" set aside a default "taken against [a party] through his or her mistake, inadvertence, surprise, or excusable neglect." (Code Civ. Proc., § 473, subd. (b).)

Under the mandatory provision, the court "shall" set aside a default based on "an attorney's sworn affidavit attesting to his or her mistake, inadvertence, surprise, or neglect, . . . unless the court finds that the default or dismissal was not in fact caused by the attorney's mistake, inadvertence, surprise, or neglect." (Code Civ. Proc., § 473, subd. (b).) "'"[R]elief is mandatory when a complying affidavit is filed, even if the attorney's neglect was inexcusable." [Citation.]' [Citation.]" (*Carmel, Ltd. v. Tavoussi* (2009) 175 Cal.App.4th 393, 401.)

This mandatory relief provision is intended "'" . . . to alleviate the hardship on parties who lose their day in court due solely to an inexcusable failure to act on the part of their attorneys."' [Citation.]" (*Henderson v. Pacific Gas and Elec. Co.* (2010) 187 Cal.App.4th 215, 226, italics omitted.)

"[T]o the extent that the applicability of the mandatory relief provision does not turn on disputed facts, but rather, presents a pure question of law, it is subject to de novo review. [Citation.] Where the facts are in dispute as to whether or not the prerequisites of the mandatory relief provision of section 473, subdivision (b), have been met, we

18

review the record to determine whether substantial evidence supports the trial court's findings.  [Citation.]"  (*Carmel, Ltd. v. Tavoussi*, *supra*, 175 Cal.App.4th at p. 399.)

Robert does not appear to contend that he was entitled to discretionary relief.  In this appeal, he relies exclusively on the mandatory relief provision.

"[T]he mandatory provision . . . 'protects only the innocent client [and] provides no relief for the culpable client who participates in conduct which led to the default . . . .' [Citation.]  If the trial court finds that the moving party's misconduct was a contributing cause of the default, that party 'cannot rely on the mandatory relief provision of section 473.'  [Citation.]"  (*Carmel, Ltd. v. Tavoussi*, *supra*, 175 Cal.App.4th at p. 400; accord, *Solv-All v. Superior Court* (2005) 131 Cal.App.4th 1003, 1010-1011 [Fourth Dist., Div. Two].)

For example, in *Lang v. Hochman* (2000) 77 Cal.App.4th 1225, the defendants failed to serve a response to the plaintiffs' request for production of documents, but they did produce documents.  (*Id*. at p. 1229.)  There was a dispute over whether they had produced all responsive documents.  The trial court granted a motion to compel, then issued two additional orders compelling further production before eventually granting a motion for terminating sanctions.  (*Id*. at pp. 1230-1241.)

The defendants retained new counsel, who filed a motion for relief from default. The motion was supported by a declaration by the defendants' former attorney to the effect that the defendants had not intentionally failed to produce documents; rather, the attorney had negligently failed to review the documents to make sure that all responsive

documents were produced.  (*Lang v. Hochman*, *supra*, 77 Cal.App.4th at pp. 1241-1242.)

The trial court denied the motion, finding that the default was caused by the "shared

misconduct" (*id*. at p. 1243, italics omitted) of the defendants as well their counsel.  (*Id*.

at pp. 1242-1243.)

The appellate court upheld the denial of relief.  (*Lang v. Hochman*, *supra*, 77

Cal.App.4th at pp. 1247-1252.)  It held that "a party can rely on the mandatory provision

of section 473 only if the party is totally innocent of any wrongdoing and the attorney was

the *sole* cause of the default or dismissal." (*Id*. at p. 1248.)  It noted that, in his

declaration, the defendants' former counsel had "attempted to take the blame . . . ." (*Id*.

at p. 1250.)  His declaration, however, had been contradicted by statements he had

previously made to the effect that he had actually recommended producing more

documents, but his clients had failed to do so.  (*Id*. at p. 1251.)  The court concluded that

there was "substantial evidence" that "shared misconduct caused the default

judgment . . . ." (*Id*. at p. 1252.)

Here, the trial court found that Robert's failure to produce documents was

"willful" and part of "a pattern of noncooperation designed to frustrate the process."

Thus, it essentially found intentional misconduct by Robert.  He does not argue that this

finding was not supported by substantial evidence.  We note, however, if only out of an

excess of caution, that it was.  When responses to the discovery were originally due,

Robert was in propria persona; he totally failed to respond.  This was before he

supposedly was injured.  Moreover, even after the date on which he later claimed the

20

injury occurred, he did not seek an extension of time on this ground. Rather, Attorney Stefanelli belatedly requested and obtained an extension of time by promising responses within "a few days." However, Stefanelli substituted out instead. Thereafter, Attorney Cottle requested and obtained a continuance of the motion for terminating sanctions, promising to respond to the discovery as well as to provide financial information to the receiver, but Cottle likewise substituted out instead.

In sum, then, Robert failed to comply with his discovery obligations when he was in propria persona; he continued to failed to comply with his discovery obligations when he was represented by Stefanelli and by Cottle, despite their promises that he would comply. All of this occurred months before Riedel was involved in the case. The trial court could reasonably conclude that Robert was equally involved in Riedel's most recent failure to comply with discovery, resulting in the default.[8] Thus, it could properly refuse to grant relief based on attorney fault.

---

[8]     The trial court could also reasonably reject Riedel's claim that the default resulted from (1) his failure to assert that Jessie had raised new factual and legal arguments in her reply and (2) his failure to request a continuance to respond to her new arguments. As noted in part II.A.2.e, *ante*, after Jessie filed her reply, Robert filed a further opposition — in effect, a surrebuttal. Thus, he had ample opportunity to respond to any new arguments. Moreover, even in connection with the motion for terminating sanctions, he did not respond to Jessie's arguments in any new or convincing way.

IV

AWARD OF $275,000 FOR BREACH OF FIDUCIARY DUTY

Robert raises two distinct challenges to the trial court's award of $275,000.  First,

he contends that the award exceeded the scope of the petition.  Second, he contends that

the award is not supported by substantial evidence.  As will be seen, we agree that the

award is void because it exceeded the scope of the petition.  Accordingly, we need not

consider whether it was supported by sufficient evidence.

Jessie filed her petition using a Judicial Council form (FL-100), as required.  (Cal.

Rules of Court, rule 5.60(a).)  The form provided checkboxes for the relief sought.  Jessie

checked the box for "Other," then typed in, "Relief for [Robert's] breach of fiduciary duty

pursuant to Family Code sections 1100 et seq."  However, she did not specify any factual

grounds, nor did she specify an amount sought.

Code of Civil Procedure section 580, subdivision (a) provides:  "The relief granted

to the plaintiff, if there be no answer, cannot exceed that which he shall have demanded

in his complaint . . . ."

"'[T]he primary purpose of the section is to guarantee defaulting parties adequate

notice of the maximum judgment that may be assessed against them.' [Citations.]" (*Stein

v. York* (2010) 181 Cal.App.4th 320, 325.)  "[D]ue process requires notice to defendants

. . . of the potential consequences of a refusal to pursue their defense.  Such notice

enables a defendant to exercise his right to choose . . . between (1) giving up his right to

defend in exchange for the certainty that he cannot be held liable for more than a known

22

amount, and (2) exercising his right to defend at the cost of exposing himself to greater liability." (*Greenup v. Rodman* (1986) 42 Cal.3d 822, 829.)

"[A] default judgment greater than the amount specifically demanded is void as beyond the trial court's jurisdiction." (*Greenup v. Rodman*, *supra*, 42 Cal.3d at p. 826.)

Civil Code section 580 applies in a marital dissolution action. (E.g., *In re Marriage of O'Connell* (1992) 8 Cal.App.4th 565, 574.) "It also applies in cases . . . where a default is entered after the defendant's answer is stricken as a discovery sanction. [Citation.]" (*Cummings Medical Corp. v. Occupational Medical Corp.* (1992) 10 Cal.App.4th 1291, 1296.)

Jessie argues that her petition gave Robert sufficient notice, citing *In re Marriage of Andresen* (1994) 28 Cal.App.4th 873 and *In re Marriage of Lippel* (1990) 51 Cal.3d 1160.

In *Lippel*, the Supreme Court held that, because the wife did not check the box for child support on her form petition, a default judgment awarding her child support was void. (See *In re Marriage of Lippel*, *supra*, 51 Cal.3d at pp. 1163-1165.) It also held that older cases cited by the wife were no longer good law in light of the enactment of the Family Law Act and the adoption of a rule of court establishing a mandatory form dissolution petition. (*Id.* at pp. 1169-1170.) It observed: "This standard form petition . . . requires a petitioner . . . to check boxes, from a series provided, which indicate the remedy or relief requested (e.g., legal separation, dissolution, or nullity of the marriage) and the specific relief being sought (e.g., property division, spousal support, child

23

custody, child support or attorney fees).  [¶]  Coupled with the requirement that the respondent be served with a copy of the petition [citation], the manner in which these boxes are checked, or not checked, informs and puts the respondent on notice of what specific relief the petitioner is, or is not, seeking."  (*Ibid*.)

Thereafter, in *Andresen*, the wife listed certain assets that were allegedly community in her form petition but did not list any values for them.  (*In re Marriage of Andresen*, *supra*, 28 Cal.App.4th at pp. 876-877.)  One of the "'Instructions'" for the form stated:  "'When this form is attached to Petition or Response, values and your proposal regarding division need not be completed.'"  (*Id*. at p. 876.)  The wife also checked the box requesting that "'property rights be determined.'"  (*Ibid*.)  After the husband defaulted, the trial court entered a judgment dividing the community assets and ordering the husband to make an equalizing payment of nearly $10,000.  (*Id*. at p. 877.)

The husband argued that the default judgment was void because the wife's petition had not alleged the values of the community assets, had not listed certain assets as community, and had not requested an equalizing payment.  (*In re Marriage of Andresen*, *supra*, 28 Cal.App.4th at p. 877.)

The appellate court responded, "In our estimation, *Marriage of Lippel* disposes of the husband's argument."  (*In re Marriage of Andresen*, *supra*, 28 Cal.App.4th at p. 878.)  It explained:  "As we read *Lippel*, due process is satisfied and sufficient notice is given for section 580 purposes in marital dissolution actions by the petitioner's act of checking the boxes and inserting the information called for on the standard form dissolution

petition which correspond or relate to the allegations made and the relief sought by the petitioner. The opinion does not suggest that any greater specificity is required. Although we acknowledge the Supreme Court had no need to address the point, we find nothing in the language of *Lippel* which compels a conclusion that the amount of the relief requested, as contrasted with the type of the relief requested, must be inserted in the relevant form if the form does not itself expressly demand such data.

"In this case, the wife requested the parties' property rights be determined because she checked the appropriate box on the petition. She also selected, again by checking a box, one of the four alternatives in . . . the petition relating to the marital assets and liabilities. In accord with the terms of this choice, the wife attached to her petition a property declaration which listed certain assets and liabilities. Consistent with the 'Instructions' in the declaration form, the wife did not assign any values to the described property or debts, or propose that they be divided in any particular manner.

"Therefore, because the wife properly and fully completed the petition and its necessary attachments to the extent of the relief requested on the face of those documents, the husband was given adequate notice that the wife sought a division of the property and liabilities identified in the wife's papers. [Citation.] If he desired to be heard on the subject of the valuation and division of the listed items, he should have appeared." (*In re Marriage of Andresen*, *supra*, 28 Cal.App.4th at pp. 879-880, fns. omitted.)

As later courts have stated, "the rule in *Andresen* 'makes sense when applied to form complaints in marital dissolution actions,' especially because in such actions 'the

25

court *must* value and divide the community estate of the parties equally . . . .' [Citation.] Given that an equal division is required by law, the due process requirement of notice is satisfied if the spouse seeking dissolution of the marriage identifies the community assets to be divided in his or her petition and requests that the court divide those assets." (*Van Sickle v. Gilbert* (2011) 196 Cal.App.4th 1495, 1527; accord, *Finney v. Gomez* (2003) 111 Cal.App.4th 527, 542; *Cassel v. Sullivan, Roche & Johnson* (1999) 76 Cal.App.4th 1157, 1162-1163.)

It would be stretching *Andresen* too far to apply it in this case. Admittedly, we are dealing with a form complaint in a marital dissolution action. However, the checkbox for "[o]ther" relief is distinguishable from the checkboxes for a division of community property. It is a catch-all category; it could encompass practically any kind of relief, including relief that is not statutorily required in a marital dissolution action. The respondent is therefore entitled to notice of the specific nature and amount of any "[o]ther" relief sought before defaulting.

"'Ordinarily when a judgment is vacated on the ground the damages awarded exceeded those pled, the appropriate action is to modify the judgment to the maximum amount warranted by the complaint.' [Citation.] The trial court, however, has discretion to instead vacate the underlying default and allow the plaintiff to amend the complaint and serve the amended complaint on the defendant. [Citation.]" (*Van Sickle v. Gilbert*, *supra*, 196 Cal.App.4th at pp. 1521-1522.)

26

Jessie might actually prefer to have the default vacated so she can litigate her claim for damages for breach of fiduciary duty in this action.  In any event, we do not want to preempt the trial court's exercise of discretion with regard to the proper remedy. Accordingly, we will remand with directions to determine whether to vacate or to modify the default judgment.

V

DISPOSITION

The orders striking Robert's responsive pleading, entering his default, and denying his motion to set aside his default are affirmed.

The judgment is void to the extent that it awards Jessie $275,000 against Robert. The matter is remanded to the trial court with directions to determine whether the judgment should be modified by striking the award of $275,000 or wholly vacated.

In the interest of justice, each side shall bear its own costs.

CERTIFIED FOR PARTIAL PUBLICATION


RICHLI                              
J.

We concur:


HOLLENHORST               
Acting P. J.


MILLER                    
J.

27